IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

KEIANTHONY D. BEAN,                    )
                                       )
v.                                     )          No. 3:05-0379
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security[1]     )
                                       )

To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Supplemental Security Income ("SSI") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff did not meet, medically equal, or functionally equal a listing on the Listing of Impairments is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and the plaintiff's motion for judgment on the record (Docket Entry No. 14) should be denied.

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

1

# I.  INTRODUCTION

The plaintiff filed an application for SSI on September 24, 2002, alleging disability due to attention deficit, hyperactive disorder ("ADHD") and asthma, with an alleged onset date of January 1, 1999. (Tr. 55-57.)  The plaintiff apparently later amended his alleged onset date to September 20, 2002. (Tr. 72, 79.)  The plaintiff's application for SSI was denied initially on December 5, 2002, and upon reconsideration on February 24, 2003. (Tr. 30-39.)

A hearing was held before Administrative Law Judge ("ALJ") Mack Cherry on August 20, 2004.  (Tr. 333.)  The ALJ issued an unfavorable decision on December 15, 2004 (Tr. 19-23).  On March 18, 2005, the Appeals Council denied the plaintiff's request for review (Tr. 5-8), and the ALJ's decision became the final decision of the Commissioner.

# II.  BACKGROUND

The plaintiff was born on August 2, 1997, and was five years old as of September 20, 2002, his alleged onset date. (Tr. 55.)  Given that he was enrolled in the second grade when the case was heard by the ALJ (Tr. 339), he did not have any past work experience. (Tr. 20.)

## A.  Chronological Background: Procedural Developments and Medical Records[2]

On October 21, 2002, the plaintiff's kindergarten teacher, Ms. Hackney, prepared a report indicating that the plaintiff performed on grade level in communications, social studies, and science (Tr. 95-98), and below grade level in mathematics. *Id.* However, the plaintiff generally worked,

---

[2] Every attempt to decipher the medical evidence of record was undertaken; however, several handwritten sections were simply illegible.

Case 3:05-cv-00379   Document 22   Filed 08/13/09   Page 2 of 30 PageID #: 66

behaved, and learned in an age appropriate manner. (Tr. 96.)  The plaintiff was not referred for special class placement, services, or tutoring. (Tr. 95.)

Ms. Hackney's report provided observations and opinions about specific characteristics of the plaintiff's behavior in school. (Tr. 96-98.)  She noted that he was easily distracted, inattentive, restless, hyperactive, and often had temper tantrums. (Tr. 97-98.)  The plaintiff occasionally fidgeted, failed to finish things he started, and turned in poor school work. *Id.*  Ms. Hackney's main concerns were the plaintiff's temper, hyperactivity, defiant behavior, and inability to control his actions while off of his medications. (Tr. 96.)  However, Ms. Hackney indicated that the plaintiff was not disobedient and did not have a difficult time learning. (Tr. 97.)  She described him as "smart, sweet, and extremely helpful and responsible. [He] has a tender heart, makes friends easily, and enjoys school." (Tr. 96.)  During the plaintiff's kindergarten year he was absent, tardy, or dismissed early from school 24 times, but the only time that he missed school due to his behavior was on October 18, 2002.[3] (Tr. 110.)

The plaintiff's performance in school improved the following year in first grade. (Tr. 108.)  His work in spelling was "excellent" and in mathematics, reading, and language it was "above average." *Id.*  Furthermore, his performance in social studies, science/health, handwriting, art, music, physical education, and Spanish was "satisfactory." *Id.*  During the first grade, the plaintiff was absent, tardy, or dismissed early from school 27 times. (Tr. 109.)  Two of the dismissals were for behavioral problems. *Id.*

---

[3] Seven of his eight tardies were because of doctor or other appointments. Two of the dismissals were specifically for doctor's appointments.

3

In the second grade, the plaintiff's teacher sent several notes home to his mother. (Tr. 245-47.) On August 30, 2004, the plaintiff threatened another student by stating "stop or I'm going to blow your head off." (Tr. 247.) Three days later, the plaintiff pretended to stab another student with a paperclip and he was placed in a quiet area for the remaining portion of the day where he continued to not follow directions. (Tr. 246.) On September 8, 2004, the plaintiff was involved in an argument with another student and the plaintiff's mother was asked to encourage him to "make better choices." (Tr. 245.)

On January 31, 2000, the plaintiff went to the Vanderbilt University Medical Center (VUMC) with difficulty breathing and was examined by a medical student.[4] (Tr. 136, 139.) Before being hospitalized the plaintiff went to the emergency room where antigen tests and chest x-rays were taken, which were consistent with respiratory syncytial virus[5] ("RSV") causing bronchiolitis.[6] *Id.* The plaintiff's wheezing decreased due to the effective treatment of Albuterol nebulizers and steroids. (Tr. 138.) Although the plaintiff was diagnosed with asthma, it was noted that he "may not have it in the strictest sense of the term as he requires no chronic therapy. His episodes may simply

---

[4] In his brief, the plaintiff indicates that he was admitted to the hospital on January 31, 1999, (Docket Entry No. 15, at 4), which is consistent with the date the plaintiff was admitted on the hospital discharge summary. (Tr. 143.) However, the same form indicates that he was discharged on February 4, 2000, and the plaintiff clearly did not stay in the hospital for a year. *Id.* The 2000 date is consistent with the dates provided on other reports prepared by Vanderbilt University Hospital that relate to the plaintiff's treatment at that time. (Tr. 134-42.) Therefore, it appears that the plaintiff was admitted to the hospital on January 31, 2000, rather than January 31, 1999.

[5] According to WebMd.com, respiratory syncytial virus is much like the common cold. It causes the same symptoms and is very contagious. Moreover, most children have it at least once before they reach the age of two.

[6] WebMd.com defines bronchiolitis as an infection that affects the small passages in the lungs.

4

be episodes of viral bronchiolitis." *Id.* Dr. Aida Yared reviewed this assessment and confirmed the diagnosis and treatment plan. (Tr. 134-35.)

On February 1, 2000, Dr. April Buchanan examined the plaintiff and noted that the Albuterol nebulizer treatments appeared to provide "some benefit" for his asthma symptoms. (Tr. 141.) Dr. Buchanan opined that "severe RSV exacerbation alone" was not likely in children at his age unless there was an underlying respiratory condition, but she concluded that he would likely benefit from the continuation of Albuterol nebulizers. *Id.* On February 4, 2000, the plaintiff was discharged from the hospital. (Tr. 143-44.) After being treated he still had "an increased expiratory phase," mild wheezes, and bilateral rales.[7] (Tr. 144.) Dr. Buchanan instructed the plaintiff to continue taking Albuterol as needed. *Id.*

On January 19, 2001, the plaintiff presented to Dr. Henry Garrard at the Vanderbilt Pediatric Clinic and he noted that the plaintiff had no recent asthma problems, had normal growth development, and was "doing well." (Tr. 131.) On February 26, 2001, the plaintiff was examined at the Vanderbilt Pediatric Clinic after he had several "accidents" at day care. (Tr. 130.) His chief complaint was listed as a bladder infection, but he was diagnosed as a well child and encouraged to make "frequent bathroom visits." *Id.*

On August 23, 2001, the plaintiff returned to Dr. Garrard for his four year-old check up, at which time he diagnosed the plaintiff with mild intermittent asthma. (Tr. 129.) He also recommended the use of "time out" and praise behavior management techniques. *Id.* The plaintiff's mother complained that the plaintiff was hyperactive, fidgety, and inattentive, and Dr. Garrard

---

[7] WebMd.com defines rales as a "moist crackling sound that can be heard with a stethoscope" which is caused by the presence of excess fluid in the lungs.

5

observed that the plaintiff had difficulty sitting still and maintaining focus. (Tr. 128.) However, other than the plaintiff's behavior issues at home, he had been doing well. *Id.* Since the plaintiff's behavior problems occurred primarily at home, Dr. Garrard did not prescribe him any medication. *Id.* On May 16, 2002, Dr. Garrard examined the plaintiff who continued to exhibit symptoms of hyperactivity and being easily distracted. (Tr. 122.) Dr. Garrard prescribed Adderall for the plaintiff and discussed the possibility that he may have ADHD. *Id.*

On June 21, 2002, the plaintiff returned to Dr. Garrard and his mother reported that he had been doing well since taking Adderall. (Tr. 120, 183.) Although Dr. Garrard diagnosed the plaintiff with ADHD, he noted that the plaintiff was happier, more focused, and calmer than during his previous examination. *Id.* The plaintiff's mother stated that she had been giving him his medicine in the morning and that it had helped him at school. *Id.* However, despite the plaintiff's improved behavior, the medication caused sleeplessness and a reduction in appetite. *Id.* The plaintiff returned to Dr. Garrard for his five-year old examination and his mother indicated that he was doing very well since taking Adderall. (Tr.118.) Although his mother related that the plaintiff was to begin counseling for his behavior, she also reported that he was doing well at school and that she was pleased with his changed behavior. *Id.* The plaintiff's mother reported that he was not currently wheezing or in respiratory distress. *Id.*

Later in 2002, the plaintiff was examined at the Vanderbilt Pediatric Clinic after complaining of chest pain, coughing and difficulty breathing. (Tr. 117.) He was diagnosed with an unspecified viral syndrome, and was told to follow-up with Dr. Garrard as scheduled. *Id.*

On October 10, 2002, the plaintiff presented to therapist Tracy Glascoe at the Vanderbilt Child and Adolescent Mental Health Center. (Tr. 201-06.) Despite reporting that Adderall had

6

really helped the plaintiff, the plaintiff's mother was concerned about his anger issues and ADHD. (Tr. 201.)  The plaintiff's mother related that prior to taking his medication, the plaintiff exhibited an inordinate amount of motor activity, talked excessively, displayed aggressive behavior, had difficulty interacting with his peers, and was bossy and cruel to his siblings. *Id.*  The plaintiff's mother explained that the plaintiff's behavior worsened in the past year and that the disciplinary techniques that used to work were no longer effective. *Id.*  She also reported that the plaintiff's "grades and behaviors" were "good" when he took his medication. *Id.* Ms. Glascoe diagnosed the plaintiff with ADHD, although she observed him as "generally very quiet," speaking with a soft voice, and compliant. (Tr. 204-05.)  Ms. Glascoe listed the plaintiff's primary weakness as his history of peer conflicts. *Id.*  Although she found that the plaintiff's memory, concentration, abstracting, insight, and judgment were all "good," she assigned the plaintiff a Global Assessment Functioning ("GAF") score of 49.[8] (Tr. 205.)

On October 21, 2002, the plaintiff presented to Dr. Cheryl Young-Wardell, a psychiatrist at the Vanderbilt Community Mental Health Center, to assess his anger and behavioral problems. (Tr. 191-99.)  The plaintiff's mother again reported that Adderall had helped the plaintiff's ADHD and hyperactivity and that her primary concern was his attitude and bad temper.  (Tr. 191.)  She related that the plaintiff does not have temper tantrums, but that he whines and starts fights. *Id.* Dr. Young-Wardell determined that the plaintiff's insight and judgment were appropriate for his age,

---

[8] The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR").  A score of 49 means that the plaintiff has "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning."  *Id.*

7

and she diagnosed him with "combined type" ADHD and assigned him a GAF score of 50.[9] (Tr. 197-98.) As part of her differential diagnoses, Dr. Young-Wardell ruled out post traumatic stress disorder, mood disorder, and adjustment disorder. *Id.* Dr. Young-Wardell increased the plaintiff's prescribed dosage of Adderall XR from 10 milligrams to 20 milligrams. (Tr. 199.)

On November 5, 2002, the plaintiff presented to psychological examiner Robert N. Doran, M.A., and clinical psychologist Dr. Mark A. Phillips, Ph.D., for a psychological evaluation. (Tr. 113-15.) The plaintiff's mother relayed to the examiners that his symptoms remained relatively unchanged, and that she assists him in maintaining proper hygiene. (Tr. 113.) She also reported that the plaintiff's behavior had improved. (Tr. 114.) Mr. Doran and Dr. Phillips concluded that the plaintiff's motor, self care, and communication skills and ability to understand and remember were not significantly limited. (Tr. 115.) They determined that the plaintiff was moderately limited in his ability to socially interact and complete tasks, but that he was capable of remembering three of three objects after periods of one, five, and 20 minute intervals, repeating a seven word sentence, and calculating basic addition and subtraction problems. (Tr. 114-15.) Mr. Doran and Dr. Phillips determined that the plaintiff had a performance IQ score of 95, verbal IQ score of 102, and a full scale IQ score of 98. *Id.* Furthermore, according to the wide range achievement test, the plaintiff tested at a kindergarten reading and spelling level, and at a preschool arithmetic level. (Tr. 115.)

---

[9] A GAF score of 50 means that the plaintiff has "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

Case 3:05-cv-00379   Document 22   Filed 08/13/09   Page 8 of 30 PageID #: 72

Mr. Doran and Dr. Phillips assigned the plaintiff a GAF score of 58-68[10] and diagnosed him with ADHD. *Id.*

On November 19, 2002, Dr. George W. Livingston, Ph.D., a Social Security Administration ("SSA") examiner, completed a childhood disability evaluation for ADHD (Tr. 145-50) and found that the plaintiff suffered less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 147.) He determined that the plaintiff did not have any limitation in moving and manipulating objects or in caring for himself, his health, and his physical well-being. (Tr. 148.) Dr. Livingston concluded that the plaintiff's impairment or combination of impairments was severe, but that he did not meet, medically equal, or functionally equal the listings. (Tr. 145.)

On December 2, 2002, SSA examiner Dr. Robert E. Burr completed another childhood disability evaluation for asthma and ADHD (Tr. 151-56), and found that the plaintiff suffered less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 153.) He determined that the plaintiff did not suffer from any limitations in moving about and manipulating objects, or in caring for himself, his health, and his physical well-being. (Tr. 154.) Dr. Burr's evaluation was internally inconsistent. Initially he determined that the plaintiff's impairments were not severe. However, he also found that the impairments were severe, but that they did not meet, medically equal, or functionally equal the listings. *Id.*

---

[10] A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34. A GAF score within the range of 61-70 means that the plaintiff has "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

9

On December 19, 2002, Dr. Garrard noted that the plaintiff was continuing to do well on his increased dosage of Adderall. (Tr. 181.) According to the plaintiff's mother, the plaintiff was having anger problems when he arrived home from school even though his treatments seemed to be working. *Id.* The plaintiff's mother related that his counselor thought that he was depressed and considered starting him on different medication. *Id.* Dr. Garrard recommended taking the plaintiff off Adderall in an attempt to identify that as the source of his mood problems. *Id.*

On February 10, 2003, SSA examiner Dr. Dina Mishu completed another childhood disability evaluation for ADHD and asthma and opined that the plaintiff had less than marked limitations in attending and completing tasks, interacting and relating with others, and caring for himself. (Tr. 159-60.) He found that the plaintiff did not have any limitations in acquiring and using information, moving about and manipulating objects, or caring for his health and physical well-being. *Id.* Dr. Mishu concluded that the plaintiff's impairment or combination of impairments was severe, but did not meet, medically equal, or functionally equal the listings. (Tr. 157.)

On February 20, 2003, Dr. Garrard completed an asthma questionnaire. (Tr. 163-65.) He determined that the plaintiff had suffered from asthma attacks that occurred regardless of prescribed treatment and that required physician intervention at least six times in the past year, but not once every two months. (Tr. 163-64.)

On April 29, 2003, Dr. Young-Wardell completed an ADHD questionnaire and found that the plaintiff exhibited a marked degree of inattention and impulsiveness and an extreme degree of hyperactivity. (Tr. 188.) Dr. Young-Wardell determined that the plaintiff did not have any impairment in age-appropriate cognitive/communicative function or age-appropriate personal functioning, and she found that he had a less than marked impairment in age-appropriate social

10

functioning and a marked impairment in maintaining concentration, persistence, or pace. *Id.*
Dr. Young-Wardell concluded that the plaintiff had major depressive syndrome. (Tr. 188.)

On September 19, 2003, the plaintiff presented to Melissa Webb-Oliver at the Mental Health
Cooperative ("MHC") for a case management assessment. (Tr. 320.) The plaintiff's mother was
concerned with the plaintiff's mood swings, behavior at school, and ability to be easily distracted.
*Id.* The plaintiff's mother indicated that the plaintiff's medications, Strattera and Lexapro,[11] were
working, but she was afraid that the medications would become ineffective. *Id.* During the
evaluation, the plaintiff ran around the room, flipped across the floor, and generally would not sit
still. *Id.* Ms. Webb-Oliver opined that the plaintiff had average intellectual functioning, an intact
memory, was anxious, and displayed appropriate behavior with signs of hyperactivity. *Id.* On
September 30, 2003, and October 22, 2003, case manager Tanya Nix evaluated the plaintiff at his
home and at his psychiatrist's office. (Tr. 325, 327-28.) The plaintiff's mother reported that his
behavior improves when he takes his medication and that she was happy with the plaintiff's therapist
and doctor. (Tr. 328.)

On October 22, 2003, the plaintiff presented to Mary M. Magestro, M.Ed., of the Vanderbilt
Department of Psychiatry with concerns stemming from his ADHD. (Tr. 243-44.) She determined
that the plaintiff had mild defiance problems, mild to moderate family relationship problems that
were improving, and moderate problems with impulsivity. *Id.* The plaintiff returned to Ms.
Magestro and Dr. Sonya Jones on October 29, 2003. (Tr. 239-42.) The plaintiff's mother informed

---

[11]Although no medical records were provided that establish the plaintiff changed medication,
he had been taking 20 milligrams of Adderall twice daily up until this record of the plaintiff's
treatment. However, a list of the plaintiff's medicine was provided to the SSA which shows that he
was first prescribed Strattera on October 9, 2003, Lexapro on August 20, 2003, and Tenex on
October 15, 2003. (Tr. 112.)

11

Dr. Jones that his behavior had improved, he was less aggressive, and he was better at following directions. (Tr. 241.)  The plaintiff also began taking Tenex in the morning, instead of at night, and that helped his ability to sleep at night.  *Id.*  From November 11, 2003, through December 16, 2003, Ms. Magestro examined the plaintiff three times and found that he had moderate problems with defiance, lying, impulsivity, and family relationships. (Tr. 233-38.)  On all three occasions the severity of the plaintiff's conditions remained constant, except for his family relationships problems, which showed improvement on November 11, 2003.  *Id.*  Ms. Magestro's treatment plan and prescribed medications remained unchanged.  *Id.*

On November 18, 2003, the plaintiff's teacher reported to Ms. Nix that the plaintiff had been behaving appropriately at school, but that he did have a problem talking without raising his hand. (Tr. 329.)

From December 23, 2003, through January 28, 2004, Ms. Magestro and Dr. Jones evaluated the plaintiff's ADHD. (Tr. 227-32.)  According to the plaintiff's mother, the plaintiff's overall behavior had improved, he was receiving good marks at school for his behavior, and he was acting more appropriately at home. (Tr. 227.)  Dr. Jones indicated that the plaintiff was very polite and cooperative (Tr. 229), and concluded that although the plaintiff had moderate ADHD problems, he was improving. (Tr. 227, 229.)  Ms. Magestro opined that the plaintiff had only mild defiance, lying, impulsivity, and family relationship problems.  (Tr. 231.)  On January 29, 2004, Ms. Nix and Cheryl Weeks, the plaintiff's new case manager, evaluated the plaintiff and found that he had made excellent progress in his behavior and grades, was calmer, and could hold a conversation. (Tr. 300-02.)

12

From January 30, 2004, through June 28, 2004, Ms. Magestro and Dr. Jones evaluated the plaintiff six times. (Tr. 213-26.) Despite the plaintiff's occasional hyperactivity his behavior was improving. (Tr. 215.) The plaintiff's mother also reported that the plaintiff had been doing well and was improving. (Tr. 213, 215, 223, 225.) Based on the plaintiff's mother's observations and statements, Ms. Magestro opined that the plaintiff had mild impulsivity and aggression problems, but that the severity of "family anger issues" fluctuated between mild and moderate severity. (Tr. 219, 221, 223, 225.) Dr. Jones concluded that the plaintiff suffered from moderate ADHD. (Tr. 213, 215, 217.)

From February 9, 2004, through July 6, 2004, Ms. Weeks evaluated the plaintiff 11 times at home and at school (Tr. 287-88, 304-19) and indicated that the plaintiff had been doing well in school in terms of his grades and behavior. (Tr. 304, 306, 308, 310-11, 313-14.) Despite these improvements, the plaintiff still had days when he displayed poor behavior and hyperactivity. (Tr. 308, 311, 315.) However, when the plaintiff had problems concentrating his teacher was usually able to assist him in completing his tasks (Tr. 315), and at home the plaintiff was no longer physically aggressive with his brothers. (Tr. 304.)

From September 20, 2004, through October 14, 2004, Ms. Webb-Oliver and Gina Dunn, a case manager, assessed the plaintiff three times. (Tr. 253-58, 295-99.) The plaintiff's mother informed Ms. Webb-Oliver that the plaintiff was having mood swings; did not sleep or focus well; and had increased irritability, hyperactivity, impulsivity, and crying spells. (Tr. 295.) Furthermore, the plaintiff's mother saw no change in the plaintiff's behavior since he had been on his medication and she believed his medicine not working. (Tr. 299.) The plaintiff's mother indicated that she

13

wanted to transfer the plaintiff to the full time case and medication management of MHC because of his poor behavior and lack of improvement. (Tr. 295.)

On October 25, 2004, Dr. Nancy Yoanidis of the MHC conducted an initial assessment and psychiatric evaluation on the plaintiff and his mother related that he was moody, violent, and sometimes in a daze. (Tr. 261-71.) Dr. Yoanidis diagnosed the plaintiff with combined type ADHD. (Tr. 261.) She also noted that Ms. Webb-Oliver had diagnosed him with disruptive behavior disorder and Dr. Yoanidis assigned him a GAF score of 45. (Tr. 261, 267.) Dr. Yoanidis further opined that the plaintiff's concentration was adequate, he was able to spell simple words forwards and backwards, and he could perform simple arithmetic problems. (Tr. 266.) Dr. Yoanidis discontinued the plaintiff's Lexapro and Strattera prescriptions, since they were ineffective and increased his irritability, but renewed his prescription of Tenex. (Tr. 261, 263.)

From November 17, 2004, through December 17, 2004, Ms. Dunn, Dr. Yoanidis, Tristin Johnson, and Beth Thompson from MHC assessed the plaintiff's behavior at home and at school. (Tr. 273-83.) On November 29, 2004, the plaintiff's mother complained that his behavior had worsened because he was having temper tantrums, was disruptive in school, and fought with other students. (Tr. 276.) The plaintiff's mother attributed this behavior to his medications not working. (Tr. 277.) Dr. Yoanidis increased the plaintiff's dosage of Tenex (Tr. 276), and the plaintiff's mother reported that he was less sedated and that his behavior improved. (Tr. 281.)

Case 3:05-cv-00379   Document 22   Filed 08/13/09   Page 14 of 30 PageID #: 78

**B. Hearing Testimony: The Plaintiff's Mother and the Plaintiff**

The plaintiff's hearing in this case was held on August 20, 2004, before ALJ Mack Cherry. (Tr. 333-64.) The plaintiff was represented by an attorney, and the plaintiff and Angela Bean, the plaintiff's mother, testified at the hearing. *Id.*

Ms. Bean testified that the plaintiff went into his brother's room approximately two weeks prior to the hearing and pushed his brother out of the top bed of a set of bunk beds. (Tr. 338.) She related that the plaintiff, by the second grade, had not failed any grades or been placed in special education or resource classes. (Tr. 339.) She testified that Dr. Garrard[12] suggested filing a disability claim in light of the plaintiff's ADHD. *Id.* Dr. Garrard and the plaintiff's mother hoped that by filing a claim, the plaintiff's school would be more sensitive to his condition and not suspend or expel him because of his behavior. (Tr. 339-40.)

Ms. Bean reported that the plaintiff missed school several times because of his behavior. (Tr. 343.) On October 30, 2003, the plaintiff and another child were involved in a fight on the school bus and the plaintiff was suspended from riding on the bus due to this behavior. *Id.* On December 9, 2003, the plaintiff missed school after "[giving a] little boy a black eye" in the school lunchroom. (Tr. 344.) Ms. Bean testified that the plaintiff cut a student's hair with his scissors and was "nasty" to his teacher when she asked him why he had cut the child's hair. *Id.* She explained that the plaintiff's behavior does not always result in official suspensions in the official school record and that she would be told to "let him have a day at home" before returning to school. *Id.* The plaintiff's second grade teacher reported that the plaintiff took staples out of her stapler during the first week of class and was pretending to stab other students with them even though the plaintiff

_____

[12] Dr. Garrard's name is spelled phonetically in the hearing transcript as "Dr. Gerard."

15

told his mother that school had been going "really good" and that there had been no problems. (Tr. 345-46.)

In March 2003, the plaintiff told his younger brother that he was going to put his "privates" in his brother's mouth and make him kiss it if he did not go to sleep. (Tr. 346-47.) His mother informed Dr. Young-Wardell about the threat and she scheduled an appointment to evaluate the plaintiff. *Id.* The plaintiff's younger brother demonstrated what the plaintiff made him do when he was at Dr. Young-Wardell's office. *Id.* Dr. Young-Wardell notified the Department of Human Services, who wanted to remove the plaintiff from his home, but Ms. Bean convinced them that it was not the plaintiff's fault because his cousin had previously sexually abused him. (Tr. 346-348.) In order to stay in his home, the plaintiff and his family had to comply with several restrictions including preventing the plaintiff from going into his brother's bedroom or the bathroom while his brother was in it. *Id.*

Ms. Bean testified that in September 2003 the plaintiff began taking Strattera[13] to treat his ADHD after his prescription was changed from Adderall.[14] (Tr. 348-49.) The medication was changed because the plaintiff had lost approximately 15 pounds over the three or four months he had been taking Adderall and it was not improving his behavior. (Tr. 349.) Ms. Bean advised that the Strattera was working better than the Adderall, but he had not gained any weight back. *Id.*

Ms. Bean explained that she asked Dr. Jones to admit the plaintiff for inpatient hospitalization "until they [could] get his medication under control," but Dr. Jones would not admit the plaintiff into the hospital because of his weight. (Tr. 351.) According to Ms. Bean, Dr. Jones

---

[13] Strattera is spelled phonetically in the hearing transcript as "Stratera."

[14] Adderall is spelled phonetically in the hearing transcript as "Aterol."

also believed that the plaintiff did not need to be hospitalized because he was not likely to do physical harm to himself. *Id.* However, Ms. Bean believed that Dr. Jones was incorrect because she had not considered the injuries he had already inflicted on himself. *Id.* For example, Ms. Bean testified about the plaintiff's wrist lacerations, scars on his forehead, and his grabbing the ceiling fan above his bed. (Tr. 352.) When asked about the plaintiff's ability to stay on task, Ms. Bean stated that he is able to complete chores as long as she is with him. *Id.*

Ms. Bean related that she had never told any of the individuals who evaluated the plaintiff that his medications were working well. (Tr. 353.) She stated that the psychiatrists documented her comments incorrectly and that the only time that she had mentioned that the plaintiff was improving was in response to questions specifically about his appetite and weight gain. *Id.* Ms. Bean vehemently denied ever telling anyone that the plaintiff's behavior was improving or that the medication was working. *Id.*

Ms. Bean testified that the plaintiff had to be hospitalized because of an asthma attack in 2000, but that he has been doing "fairly good" since that incident. (Tr. 354-55.) According to Ms. Bean, the doctors at the hospital informed the plaintiff's mother about what triggers asthma attacks and sent her home with a nebulizer. (Tr. 355.) Ms. Bean testified that she still smokes, but no longer in the house, and the family's three dogs stay outside. (Tr. 356.) Ms. Bean expressed her belief that she has "done a pretty good job trying to keep him from having those problems." (Tr. 355.) She testified that she is usually able to treat the plaintiff at home when he has an asthma attack. *Id.* The plaintiff has a bike, but has not "mastered how to ride it," and he does not like playing sports. (Tr. 357-58.) The plaintiff's mother testified that his condition has not changed significantly since August 2003. (Tr. 358.)

After Ms. Bean testified, the plaintiff testified that he comes home after school and lies down for a period of time. (Tr. 361.) He related that he enjoys playing checkers, video games, hockey, basketball, and soccer, and plays with his dogs.[15] (Tr. 361-62.)

### III. THE ALJ'S FINDINGS

Based on the record the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since the alleged onset date.

2.    The claimant has the following medically determinable severe impairments asthma and ADHD.

3.    The subjective allegations are not fully credible for the reasons described above.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals a Listing, or functionally equals the severity of the Listing set forth in the Listings of Impairments.

5.    The claimant's impairments do not result in "marked and severe" functional limitations.

6.    The claimant is not disabled within the meaning of the Social Security Act.

(Tr. 22-23.)

---

[15] The ALJ did not allow plaintiff's counsel to recall Ms. Bean to testify about the discrepancy in her testimony and the plaintiff's testimony about playing sports. (Tr. 262-63.) *See* Docket Entry No. 15, at 14.

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

To be eligible for childhood disability benefits, the plaintiff must meet the definition of disability set forth at 42 U.S.C. § 1382c(a)(3)(C):

An individual under the age of 18 shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months.

The Commissioner's regulations implementing this statutory standard consist of a three step process set forth at 20 C.F.R. § 416.924. *See, e.g., Lowery v. Comm'r of Soc. Sec.*, 55 Fed. Appx. 333, 335-36 (6th Cir. Jan. 30, 2003). The regulations require, at the first step, that the child not have engaged in "substantial gainful activity" during the relevant period. 20 C.F.R. § 416.924(a). At the second step, the child will be deemed not disabled if the child does not have a "severe" impairment, i.e., an impairment which causes more than minimal functional limitations. *Id.* If the child has such an impairment, he will be conclusively presumed disabled if he meets, medically equals, or functionally equals one of the impairments specified in the Listing of Impairments, found in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The burden of proof lies with the plaintiff to prove that he is disabled. *See Lowery*, 55 Fed. Appx. at 335-36; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir.1993)).

In ascertaining functional equivalence, the ALJ must "assess the functional limitations caused by a child's impairments." *Washam v. Astrue,* 2009 WL 864743, at *2 (E.D. Ky. March 30, 2009) (citing 20 C.F.R. § 416.924a(a)). A child's functional limitations are measured using six broad functional areas or "domains:" "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i-vi). The purpose of these domains is to "capture all of what a child can or cannot do." *Washam,* 2009 WL 864743 at *2 (citing 20 C.F.R. § 416.926a(b)(1)). A child's "medically

determinable impairment or combination of impairments" will equal a listed impairment if it results in "'marked'" limitations in two of the listed domains, or an "'extreme'" limitation in one of the listed domains. 20 C.F.R. § 416.926a(d). *See also Washam,* 2009 WL 864743 at *2 (citing 20 C.F.R. § 416.926a(e)).

## B.  The Three-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step three of the three-step process. (Tr. 22-23.)  At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial gainful activity since the alleged onset date of September 20, 2002. (Tr. 20.) At step two, the ALJ found that the plaintiff suffered from severe impairments of ADHD and asthma. *Id.*  At step three, the ALJ determined that the plaintiff's impairments did not meet, medically equal, or functionally equal at least one of the listed impairments in Appendix 1, Subpt. P, Regulation No. 4. (Tr. 23.)

## C.  The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in finding that the plaintiff's impairments did not meet the Listings and that the plaintiff's mother's testimony and statements about the plaintiff's condition were not fully credible. Docket Entry No. 15, at 19-23.  The plaintiff also contends that a sentence six remand is appropriate because of newly discovered evidence. Docket Entry No. 15, 23-24.

21

**1. The ALJ properly found that the plaintiff's impairments did not meet the listings for ADHD and asthma.**

      **(i) ADHD**

The plaintiff asserts that the ALJ improperly found that he did not meet the listing for ADHD at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11. Docket Entry No. 15, at 19. The plaintiff argues that "the deficit in meeting the ADHD listings precisely is more than made up for" by his extreme hyperactivity and symptoms of major depressive disorder. Docket Entry No. 15, at 20.

For the plaintiff to meet a listing, he must satisfy all of the specific medical criteria in that regulation. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). *See, e.g., Nunn v. Bowen*, 828 F.2d 1140, 1144 (6th Cir. 1987). Demonstrating that an impairment meets only some of the criteria is not sufficient to find that the plaintiff is disabled regardless of the severity of the criteria that is established. *Sullivan*, 493 U.S. at 530. The listing for ADHD requires that a child have a marked level of severity in inattention, impulsiveness, and hyperactivity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11A. To be disabled the child must also exhibit marked impairments in at least two of the following domains: age-appropriate cognitive/communicative function, age-appropriate social functioning, age-appropriate personal functioning, or difficulties in maintaining concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11B (referring to criteria listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02B2). All of the part B criteria must be documented by history or medical findings, which includes consideration of information provided by parents and other individuals who know the child. *Id.*

Dr. Young-Wardell found that the plaintiff demonstrated inattention and impulsiveness to a marked degree. (Tr. 188.) These findings satisfy part A of the listing for ADHD, a point the defendant does not challenge. Docket Entry No. 18, at 8. Thus, the plaintiff has fulfilled the

requirements for Part A of the listing and the Court's analysis shifts to determining whether the ALJ erred in finding that the plaintiff did not meet Part B of the listing.

In the same assessment, Dr. Young-Wardell determined that the plaintiff had no impairment in age-appropriate cognitive or communicative functioning or age-appropriate personal functioning, but did have a less than marked impairment in age-appropriate social functioning and a marked difficulty in maintaining concentration, persistence, or pace. (Tr. 190.) This report indicates that the plaintiff has a marked impairment in one of the four criteria provided in Part B of the listing. *Id.* Yet, in order to be disabled the plaintiff must provide documented medical or historical evidence that establishes that he had a marked impairment in two of the listed domains. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11B (referring to the criteria listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02B). Although the plaintiff is aware that he does not meet all of the requirements in the listing, he argues that his extreme hyperactivity and Dr. Young-Wardell's diagnosis of depressive mood disorder compensates for the deficiencies. Docket Entry No. 15, at 20. However, because the plaintiff has not satisfied the listing with exactitude, the severity of his hyperactivity and a diagnosis for another mental disorder that was not alleged to be disabling does not overcome his failure to meet all the criteria. *See Sullivan*, 493 U.S. at 530. Therefore, the ALJ did not error in deciding that the plaintiff did not meet the listing for ADHD.

The plaintiff also contends that he functionally meets the listing for ADHD. Docket Entry No. 15, at 20. For a child to functionally equal a listing or be of listing-level severity, he must have "'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a). The six domains are broad areas of functioning designed to capture a child's ability to acquire and use information, attend and complete tasks, interact and relate with

23

others, move about and manipulate objects, and care for his health and physical well-being. 20 C.F.R. § 416.926a(b)(i)-(iv).

After applying the domains for children, the ALJ concluded that the plaintiff did not functionally equal the listing. (Tr. 21-22.) The ALJ specifically found that the plaintiff was not limited in acquiring and using information, moving and manipulating objects, and caring for himself. (Tr. 22) The ALJ also determined that the plaintiff had a less than marked limitation in attending and completing tasks, interacting and relating with others, and caring for his health and physical well-being. (Tr. 22.) The plaintiff's argument concerning functional limitations neglects the factors provided in the regulation and relies solely on the theory that he is functionally limited because of his extreme hyperactivity and being diagnosed with depressive mood disorder. Docket Entry No. 15, 19-20. Evaluations by Dr. Livingston, Dr. Burr, and Dr. Mishu all support the ALJ's determination that the plaintiff's impairment or combination of impairments was severe, but did not meet, medically, or functionally equal the listing. (Tr. 145, 151, 157.) Dr. Livingston and Dr. Burr came to the same conclusions regarding the plaintiff's functional domains. They found that the plaintiff had no limitation in moving about, caring for himself, or in his health and physical well-being, and less than marked limitations in acquiring and using information, attending and completing tasks, and interacting with others. (Tr. 147-48, 153-54.) Dr. Mishu also determined that the plaintiff had no limitation with his health and physical well-being, in acquiring and using information, or in moving about and manipulating objects. (Tr. 159-60.) He found that the plaintiff had a less than marked limitation in attending and completing tasks, interacting and relating with others, and caring for himself. *Id.* Although the doctors came to slightly different conclusions regarding the level of limitations in those domains, none of them determined that the plaintiff had a marked or extreme

limitation in any of the domains.  Therefore, substantial evidence supported the ALJ's conclusion that the plaintiff was not functionally limited by ADHD.


### (ii) Asthma

The plaintiff also contends that the ALJ erred in determining that he did not meet the listing for asthma provided at 20 C.F.R. Pt. 404, Subpt. P, § 103.3B. Docket Entry No. 15, at 19.  In making his assertion, the plaintiff relies on the Asthma Questionnaire Dr. Garrard completed. (Tr. 163-65.)

Before a person can be considered disabled under the Listing of Impairments, he must meet all its criteria. *Sullivan*, 493 U.S. at 530.  *See, e.g., Nunn*, 828 F.2d at 1144.  As previously noted, merely providing evidence that some of the criteria has been satisfied is not sufficient to determine that the person is disabled without regard to the severity of criteria that is shown. *Sullivan*, 493 U.S. at 530.  Under the listing for asthma, a person is disabled if he has:

> A.  $FEV_1$ [one-second forced expiratory volume] equal to or less than the value specified in table I of 103.02A; Or
> B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year.  Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 months must be used to determine the frequency of attacks; Or
> C.  Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic brochodilators with one of the following:
>> 1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
>> 2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period; Or
> D.  Growth impairment as described under the criteria in 100.00.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.3B.

Case 3:05-cv-00379   Document 22   Filed 08/13/09   Page 25 of 30 PageID #: 89

Dr. Garrard reported that the plaintiff had never received pulmonary function testing, so it could not be determined whether he had an $FEV_1$ less than or equal to the values in table I of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.02A. (Tr. 163.)  He also indicated that the plaintiff did not have any growth impairments. (Tr. 165.)  While there were radiographic or other imaging techniques that documented pulmonary hyperinflation or peribronchial disease and persistent prolonged expiration as well as daytime and nocturnal use of sympathometic bronchodilators, the plaintiff did not suffer from "[p]ersistent low-grade wheezing between acute attacks" nor was there an "absence of extended symptom-free periods." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 103.3B. Consequently, Dr. Garrard's findings prevents the plaintiff from meeting the listing in all but section B.

An asthma attack is defined as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator therapy in a hospital, emergency room or equivalent setting."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00C.  However, if the person's asthma is controllable with medication he does not meet the listing because he does not have attacks in spite of prescribed medicine. *Auer v. Sec'y of Health & Human Servs.*, 830 F.2d 594, 595 (6th Cir. 1987).

Dr. Garrard determined that the plaintiff has had asthma attacks that, despite prescribed treatment, occasionally required physician intervention at least six times a year, but not once every two months. (Tr. 163-64.)  Dr. Garrard completed the questionnaire on February 20, 2003, after which the plaintiff's mother testified that the plaintiff had been doing "fairly good" and that she was able to treat most of his problems at home with a nebulizer. (Tr. 355.)  Ms. Bean's statements are supported by Dr. Garrard's reports which provide that the plaintiff had only "mild intermittent

26

asthma" and that there were "no recent asthma exacerbations." (Tr. 129, 131.) Since the plaintiff's asthma attacks were controllable by medication, there is substantial evidence in the record to support the ALJ's finding that the plaintiff's asthma was "ancient history." (Tr. 20.)

### 2. The ALJ properly determined that the mother's testimony regarding the plaintiff's condition was not credible.

The plaintiff claims that the ALJ erred by not finding his mother's testimony fully credible. Docket Entry No. 15, at 21. The plaintiff argues that his mother's testimony more aptly describes his condition than do the reports of the doctors and mental health professionals, because she spends the most time with him and the doctors and mental health professionals are not able to observe his behavioral problems as frequently. *Id.*

The ALJ is charged with evaluating the credibility of witness testimony when that testimony is inconsistent with the medical evidence in the record. *Anthony v. Astrue*, 266 Fed. Appx. 451, 460 (6th Cir. Feb. 22, 2008) (citing *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984)). The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

The ALJ found that the plaintiff's mother's subjective complaints were not fully credible and that she "clearly exaggerated his behavior problems." (Tr. 22.) Further, there are numerous instances in which Ms. Bean stated that his behavior had improved or his medication had been working. (Tr. 181, 213, 215, 217, 222, 225, 227, 241.) During the hearing, Ms. Bean testified that

27

she never told anyone that the plaintiff's behavior was improving with medication and that her statements were not recorded properly by the doctors. (Tr. 353.) The ALJ noted that the plaintiff had a bad temper, but attributed his anger management problems to a lack of oversight by his mother.[16] (Tr. 22.) In determining that the plaintiff's mother's subjective complaints were not fully credible, the ALJ relied on the statements that she made to mental health professionals. (Tr. 22.) Due to the inconsistencies in the plaintiff's mother's statements to the ALJ and her statements as reported by doctors, the ALJ properly concluded that her testimony was not fully credible.[17] *Id.*

The plaintiff also assigns error to the ALJ's determination that the plaintiff's mother's testimony about his asthma lacked credibility. Docket Entry No. 15, at 21. The ALJ found that her subjective complaints lacked credibility because of the activities in which the plaintiff engaged, and he cited to instances in which the plaintiff cared for the family's three dogs[18] and the proximity he maintained to individuals who smoked. (Tr. 22.) More significantly, the plaintiff's mother's testimony that his asthma was being controlled with medication at home and medical evidence that

---

[16] There is nothing in the record to support the ALJ's suspicion that the plaintiff's behavioral problems or ADHD are attributable to his mother's "poor oversight." Whatever "poor oversight" means, the record emphatically portrays a mother who has attempted to address her son's behavior, has consistently sought help and treatment, and has worked with his teachers and schools. The Court is further troubled by the ALJ's demeaning comments that Ms. Bean used "tears for emphasis" in relating a "sex incident" and by his description of the plaintiff's inappropriate behavior as a "sexual misadventure." (Tr. 22.) However, despite these comments, the Court finds that there is substantial evidence in the record to support the ALJ's determination of Ms. Bean's credibility.

[17] The Court acknowledges that a physician or other health care provider may mis-report or misinterpret a patient's report. However, given the frequency of the reporting that Ms. Bean had noted improvement by several different health care providers, it was reasonable for the ALJ to rely upon those records.

[18] While the ALJ may be correct that living with dogs may be contraindicated for children–or people–with asthma, there is nothing in the record to support that conclusion and nothing in the record reflecting any doctor having recommended that the plaintiff not be exposed to dogs.

28

the plaintiff had only mild intermittent asthma provides substantial evidence to support the ALJ's determination that the plaintiff's asthma was no longer a significant problem. (Tr. 129, 131, 287, 355.)

### 3. A sentence six remand under 42 U.S.C. § 405(g) is inappropriate to consider the new evidence provided to the Court.

The plaintiff contends that a sentence six remand under 42 U.S.C. § 405(g) is proper because new evidence was provided to his attorney after the hearing, and thus it was not considered by the ALJ when he made his decision. Docket Entry No. 15, at 23-24. The new evidence consists of two notes from the plaintiff's teacher and the complete records from the MHC. (Tr. 245-46, 253-332.)

This Court can require an ALJ to consider new evidence on remand only if good cause is shown and the evidence is material to the outcome. 42 U.S.C. § 405(g). There is good cause to remand a case when more evidence is necessary to develop the facts needed to allow the Commissioner to make a decision on the issue. *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980). However, good cause has not been shown if the new evidence is merely cumulative or would not cause there to be a reasonable chance that the Commissioner would change his decision. *Id.*

The two teachers' notes, added by the Appeals Council to the administrative record, demonstrated that the plaintiff had aggression problems toward other students in his class. (Tr. 245-46.) However, the doctors' medical records already indicated that the plaintiff suffered from aggression issues, but was improving. (Tr. 219, 221, 223, 225.) The two teachers' notes are duplicative in nature and do not result in a reasonable probability that the Commissioner would change his decision after reviewing the teacher's notes. The progress notes from the MHC provide that the plaintiff enjoys school and occasionally has days when his behavior is a problem, but that

29

his medication generally seemed to be working.  (Tr. 258, 281, 302, 308, 310, 311, 315, 320.) Although the records from the MHC offer more evidence of the mother's subjective complaints about the plaintiff's behavior, they also demonstrate further inconsistencies in her statements. (Tr. 263, 264, 274, 276-77, 281, 295, 299, 300, 302, 304, 311, 320, 328, 332.)  Along with the inconsistent statements about the plaintiff's behavior and effects of the medication, the progress notes contain observations from case managers that provide objective proof that the plaintiff was well-behaved.  (Tr. 266, 281, 287, 301, 310, 329.)  The observations from the case managers and the inconsistencies from the mother's statements preclude a determination that a sentence six remand is appropriate.

## V.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 14) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made.  Failure to file written objections within the specified time can be deemed a waiver of right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge

30